GERALDINE M. SHAW, DONALD R. SHAW AND LINDA J. VARNUM.
v.
PLANTATION MANAGEMENT, L.L.C., D/B/A HARVEST MANOR NURSING HOME, RELIANCE INSURANCE COMPANY, AND JOHN M. ROLLINSON.
No. 2008 CA 1467
Court of Appeals of Louisiana, First Circuit.
March 27, 2009.
Not Designated for Publication.
JOHN P. AYDELL, JR. Baton Rouge, La, DAVID A. ABRAMSON, New Orleans, La, Counsel for Plaintiffs/Appellants, Geraldine Shaw, et al.
CHARLES A. SCHUTTE, Jr. Baton Rouge, LA, Counsel for Defendant/Appellee, Plantation Management Company, L.L.C., D/B/A Harvest Manor. Nursing Home.
Before: CARTER, C.J., WHIPPLE and DOWNING, JJ.
DOWNING, J.
In this appeal the relatives of an elderly man residing in a nursing home claim that his fall and ultimate death were caused by his slipping in his roommate's urine. Plaintiffs filed suit against the nursing home for negligently maintaining the premises. After a trial on the merits, the trial court rendered judgment in favor of the nursing home, concluding that plaintiffs did not prove causation. From that judgment, plaintiffs appeal. For the following reasons, we affirm the judgment.

FACTS AND PROCEDURAL HISTORY
Plaintiffs/appellants, Geraldine M. Shaw, Donald R. Shaw and Linda J. Varnum, sued Plantation Management Company, L.L.C., d/b/a Harvest Manor Nursing Home, and Reliance Insurance Company,[1] (collectively, Harvest Manor), whose negligence, they claim, led to the death of Ivan Shaw. The trial court dismissed plaintiffs' suit. Plaintiffs allege in their appeal that the trial court erred by failing to find that the evidence showed, more probably than not, that Mr. Shaw slipped and fell in Mr. Shaw's roommate's urine, thus, establishing causation and giving rise to a presumption of negligence.
The situation encompassing the alleged negligence is as follows:
Eighty-three year old Ivan Shaw was suffering from dementia and psychosis. On January 3, 2000, he was admitted to Harvest Manor and was placed in a secured section, known as the locked unit, because of his reported behavior while living at home. The locked unit is reserved for patients with behavior problems associated with Alzheimer's disease, dementia, or suffering from other abnormal behavior problems.[2]
The locked unit holds up to twenty-five people and is kept locked because many of the residents residing in this unit are confused and wander aimlessly.[3] The locked unit is self-contained with a sitting area, patio, dining room and ten bedrooms. Each two bedrooms share a bath.
Mr. Shaw's roommate, John Rollinson, was suffering from senile dementia. Mr. Rollinson had recently transferred into the locked unit because of his conduct on the regular ward. Namely, he was urinating on other patient's beds.[4] Mr. Rollinson suffered incontinence and wore pads or diapers at night. There is no evidence that Mr. Shaw was incontinent of bowel or bladder, but he was on Flomax, a medication commonly prescribed for bladder control.[5] Both Mr. Shaw and Mr. Rollinson were ambulatory and free to use the bathroom without assistance.
On Mr. Shaw's third night at Harvest Manor he got out of bed, slipped, and fell to the floor. The attending nurse, Nurse Betty Carney, who did not testify, made a notation in her chart that Mr. Shaw told her he got up to use the bathroom and slipped in urine on the floor. He also told her that the urine was not his.[6]
Mr. Shaw was taken by ambulance to the hospital where it was determined that he sustained a right hip fracture with displacement. William J. Hubbard M.D., an orthopedist, immediately performed an internal fixation surgical intervention. On January 13, 2000, while still at the hospital, Mr. Shaw suffered breathing difficulties. His condition worsened and he passed away on January 14, 2000. The cause of death was obstructive apnea. Mr. Shaw had a history of chronic obstructive pulmonary disease (COPD). In addition, he had an earlier surgery performed on his throat due to mandibular carcinoma, which caused the progressive loss of muscle tone at the back of his throat and neck used to maintain the breathing airway.[7]
Plaintiffs' petition alleges that Harvest Manor assigned Mr. Shaw to a room with Mr. Rollinson when it had notice that Mr. Rollinson's incontinence in urinating on the floor had manifested itself in the past. Plaintiffs claim that Harvest Manor failed to take steps to isolate Mr. Rollinson from other patients or to protect these patients from wet floors where they were likely to walk.[8]

DISCUSSION
The focus of this appeal is on whether the trial court had a reasonable factual basis to conclude that plaintiffs had not proven causation. Plaintiffs argue that the trial court incorrectly concluded that there were only two pieces of documentary evidence supporting their petition: (1) Mr. Shaw's statements to the nurse who found him on the floor and (2) Nurse Susan Hicks' note of January 3, 2000, which said, in pertinent part, that Mr. Rollinson was very confused during the daytime, and worse in the evening, and at night, he gets out of bed and urinates on other patient's beds, and the floor, etc., and that she was concerned for the patient's safety.[9]
Plaintiffs contend that the trial court ignored the testimony of Peter Green, R.N., Harvest Manor's Director of Nursing. Plaintiffs argue that Mr. Green testified that when he spoke to Nurse Carney, who did not testify, she informed him that Mr. Shaw slipped in urine and that she observed a liquid substance on the floor where Mr. Shaw fell. Plaintiffs argue that the most reasonable explanation for liquid to be on the floor at 2 o'clock a.m. is that it came from Mr. Rollinson. Plaintiffs further argue that it is unlikely that the urine on the floor was Mr. Shaw's since there is no evidence he suffered flow incontinence. Furthermore, Mr. Shaw told Nurse Carney that the urine was not his.
A plaintiff, in a slip and fall case against a hospital[10] must show the fall occurred and injury resulted from a foreign substance on the premises. See Neyrey v. Touro Infirmary, 94-0078, p. 4 (La.App. 4 Cir. 6/30/94), 639 So.2d 1214, 1216; Reynolds v. St. Francis Medical Center, 597 So.2d 1121, 1122 (La.App. 2 Cir. 1992). The burden then shifts to the hospital to exculpate itself from the presumption of negligence. Id. Plaintiffs are trying to trigger this presumption.
This test requires that causation must be established before the presumption applies. In personal injury suits the test for determining the causal relationship between the incident in question and the subsequent injury is whether the plaintiff proved that it was more probable than not that the subsequent injury was caused by the accident. Detraz v. Lee, 05-1263, p. 5 (La. 1/7/07), 950 So.2d 557, 560. In this case, the trial court specifically stated that it could not find, more probably than not, that Mr. Rollinson got out of bed sometime prior to 2:00 o'clock a.m., urinated next to Mr. Shaw's bed, and that the presence of urine on the floor was the cause of Mr. Shaw's fall. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently. Detraz, 05-1263 at p. 7, 950 So.2dat561.
Plaintiffs urge this court to consider Peter Green's statement regarding Nurse Carney's statement to him as an admission that there was a liquid on the floor and that Mr. Shaw fell because he slipped in that liquid. A careful reading of Mr. Green's statement, hearsay aside, only indicates that Nurse Carney told him there was liquid on the floor. He asked how she knew the liquid was urine, but there is nothing in the record indicating that she ever responded to this question.
Even assuming Nurse Carney saw something wet on the floor, there is no proof regarding when or how the liquid came to be there. Nor is there any evidence that the substance on the floor was the cause of Mr. Shaw's fall. Mr. Shaw's granddaughter, to whom he lived next door, told the admissions clerk that Mr. Shaw was unsteady on his feet. The admissions clerk also noted that Mr. Shaw was addled and confused much of the time.[11] We therefore conclude that the trial court did not err in failing to give weight to the statements in the record that a substance on the floor caused the fall. Double hearsay and Mr. Shaw's mental and physical conditions aside, there is no corroborating evidence that Mr. Shaw fell because he slipped in liquid that was on the floor. Even if Nurse Carney saw a liquid substance on the floor when she came to Mr. Shaw's assistance, the liquid could have come from Mr. Shaw himself after falling.
As discussed above, we do not consider whether Harvest Manor breached its duty to the resident because plaintiffs have not met their burden in establishing a causal relationship between the accident and the subsequent injury. Detraz, 05-1263 at p. 5, 950 So.2d at 560. Reviewing the record in its entirety, the absence of corroborative physical evidence, together with Mr. Shaw's history of unsteadiness on his feet and his confusion, we cannot conclude that the trial court erred in making its determination. Causation is a factual finding which should not be reversed on appeal absent manifest error. Detraz, 05-1263 at p. 7, 950 So.2d at 561. Accordingly, this assignment of error is without merit.

DECREE
For the reasons stated herein, the judgment of the trial court is affirmed. The cost of this appeal is assessed against the plaintiffs/appellants Geraldine M. Shaw, Donald R. Shaw and Linda J. Varnum.
AFFIRMED
NOTES
[1] John M. Rollinson. the roommate, was also named as a defendant for failing to exorcise due caution while urinating. Mr. Rollinson died while discovery was pending and no further action was laken against him.
[2] Dr. Susan Nelson ordered Mr. Shaw's admission to the unit; Donald Shaw signed the consent form, which stated that only residents showing behavior problems would be admitted into the unit. Unruly outbursts and socially inappropriate behavior are examples of such behavior problems.
[3] These patients are not restrained pursuant to regulations in the Patient's Bill of Rights.
[4] Susan Hicks. LPN, testified in deposition that Mr. Rollinson was transferred into the unit for his own, as well as other patient's, safety. She further testified thai on at least one occasion, he urinated on another patient's bed. She noted on January 3, 2000, "9:30 p.m., patient moved to another room. Very confused during the daytime, worse in evening. At night patient gets out of bed and urinates on other patients' beds, floor, et cetera. Some concern of patient safety. Patient stable at this time."
[5] Because of a benign prostatic hypertrophy, Mr. Shaw had previously undergone a transurethral resection of the prostate. This is a procedure where a tube is placed through the prostate and into the bladder to allow urine to drain past the enlarged prostate. Incontinence is a frequent side-effect after this procedure.
[6] The Baton Rouge General Medical Center notes dated January 6, 2000, contains a notation from an unknown source that Mr. Shaw fell in his roommate's urine.
[7] Richard Mark Slataper, M.D. explained in his deposition, that prior to Mr. Shaw's death, he was having airway difficulties resulting in respiratory distress. Dr. Slataper testified that the nature of these difficulties were intermittent. At limes he was fine and other times the airway would become partially collapsed, "litis condition is called obstructive sleep apnea. He explained that this can be caused by obesity or as in this case, lack of muscle tone. He testified that the extensive neck dissection from a previous surgery added to Mr. Shaw's condition. He said that this condition is self-perpetuating in that when the airway isn't working well, then you begin to retain carbon dioxide which further decreases the muscular lone. He explained that people with this condition often have behavior problems, but he could not say if this was the cause of Mr. Shaw's behavior problems.
[8] Plaintiffs also present two arguments in the event this court finds merit in plaintiffs' first assignment of error. Since we are affirming the trial court judgment, these issues are pretermitted.
[9] In the court's written reasons, it stated in pertinent part:

Plaintiffs contend the defendant is at fault for the slip and fall of Mr. Ivan Shaw for allowing John Rollinson, another resident of the nursing home, and Mr. Shaw's room mate to urinate on the floor thus creating an unreasonable risk of harm to Mr. Shaw when he attempted to go to the bathroom. The plaintiff bears the burden of proving by a preponderance of the evidence this contention. The only evidence that supports this contention came from Mr. Shaw and Susan Hick's nurse's notes. At approximately 2:00 o'clock a.m. on January 6, 2000, Mr. Shaw was found on the floor of his room by Betty Carney, LPN. Mr. Shaw was complaining of severe pain to his right hip. Mr. Shaw stated he had fallen after slipping in urine on the floor on his way to the bathroom. He stated the urine was not from him. Nurse Susan Hicks indicated in her January 3, 2000, nurse notes concerning John Rollinson, "...At night pt. gets out of bed and urinates on other pts. beds, floor, etc. Concerned of pts' safety. Pt. stable @ this time." While these statements are circumstantial evidence that Mr. Shaw's fall may have occurred in the manner alleged by the plaintiff, this court cannot reach the conclusion more probably than not that, Mr. Rollinson got out of bed sometime prior to 2:00 o'clock a.m and urinated next to Mr. Shaw's bed and further that the presence of urine on the floor was the cause of Mr. Shaw's fall.
[10] This standard has been applied to other health care providers as well as hospitals. See Millet v. Evangeline Health Care, Inc., 02-1020, p. 6 (La.App. 5 Cir. 1/28/03), 839 So.2d 357, 361.
[11] An example of this was the notation Dr. Susan Nelson wrote in Mr. Shaw's progress notes. The notation states:

"[according to the family, Mr. Shaw was outside beating on the garbage cans-chasing cats & stripped off his clothes @ 3 a.m. The granddaughter had to go over to Mr, Shaw's and direct him back inside his house to get him dressed."